**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **RICK BARRY, SR., et al.,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **CIVIL NO. JKB-25-2393** |
| **DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

### I.   Introduction

In October 2022, Javarick Gantt was strangled to death by his cellmate, Gordon Staron, while in the custody of the Maryland Department of Public Safety and Correctional Services's ("DPSCS") Central Booking facility in Baltimore. Plaintiffs—Mr. Gantt's surviving family members—brought suit against DPSCS and a number of individuals in the Circuit Court for Baltimore City in June 2025, and Defendants removed to this Court in July 2025. (ECF No. 1.) Now pending are motions to dismiss filed by all Defendants. (ECF Nos. 16, 22.) The motions have been fully briefed (*see* ECF Nos. 25, 31, 32) and no hearing is required. *See* Local Rule 105.6 (D. Md. 2025).

The motions will be granted in part and denied in part. All claims against the unnamed Custody Doe Defendants will be dismissed without prejudice, and Count X, for Indemnification, will be dismissed. All other claims will survive as described below.

## II.    Background

### A.    Factual Allegations[1]

In July 2022, Mr. Gantt was a pretrial detainee committed without bail to Central Booking in Baltimore for failing to appear in court and failing to report to his probation agent, in relation to underlying charges of second-degree assault and third-degree burglary. (*Id.* ¶¶ 36–39.)

Plaintiffs allege that Mr. Gantt's intake screening at Central Booking was improper. (*Id.* ¶¶ 40–55.) Mr. Gantt was deaf and relied on sign language to communicate. (*Id.* ¶ 33.) Mr. Gantt filled out a form called an Inmate Auxiliary Aids or Services Designations Form and explained that he was hearing impaired and needed an interpreter. (*Id.* ¶ 41.) His disability was documented within the Offender Case Management System. (*Id.* ¶ 45.) However, the Designations Form Mr. Gantt was provided did not list any auxiliary aids or services that were available to him. (*Id.* ¶ 43.) Instead, in the space where such services were supposed to be listed, the Form included only the request: "Assistant Warden / Facility ADA Coordinator, please list aids and services at the facility." (*Id.*) Mr. Gantt was not in fact provided with any auxiliary aids or a qualified interpreter. (*Id.* ¶¶ 42, 44.) While deaf pretrial detainees could be housed in special housing units at Maryland Correctional Institution Jessup (another DPSCS facility), Mr. Gantt was not offered such housing, and Central Booking did not provide any special housing for inmates with disabilities—despite a DPSCS directive that inmates with special needs be housed separately from the general population. (*Id.* ¶¶ 52–53.) Further, during the course of his detention, Mr. Gantt demonstrated a vulnerability to violence resulting from his disability—Plaintiffs allege that the Supervisor Defendants and Correctional Officer ("CO") Defendants[2] were aware that Mr. Gantt could not call out for help in

---

[1] The facts recited here are those alleged in the Complaint (ECF No. 2). At this stage of the case, the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005).

[2] The Court identifies the specific Defendants in each of these categories below.

the event of an emergency because, less than a week before Mr. Gantt's death, these Defendants observed Mr. Gantt asking for help but using sign language to do so. (*Id.* ¶¶ 83–84.)

Plaintiffs allege that Mr. Gantt's screening for a risk of victimization at Central Booking was also improper. (*Id.* ¶¶ 47–51.) In addition to being deaf, Mr. Gantt was just over five feet tall and a little over one hundred pounds as an adult. (*Id.* ¶ 33.) Given Mr. Gantt's height and weight, his age, and the nature of the charges pending against him, Plaintiffs allege that Mr. Gantt qualified for a low security level. (*Id.* ¶ 48.) However, Mr. Gantt's low security score was overridden by a Central Booking case manager, without justification, which resulted in Mr. Gantt being placed in the general population, with a medium security level. (*Id.* ¶¶ 49–51.) Plaintiffs allege that that the Supervisor Defendants knew or should have known about the improper override of Mr. Gantt's calculated security level, and that Mr. Gantt's placement violated a directive to classify inmates in the least restrictive security level consistent with their needs, public safety, and the safe and orderly operation of the facility. (*Id.*)

Beyond being housed in the general population, Plaintiffs allege that Mr. Gantt should not have been housed with Mr. Staron in particular—Mr. Staron should not have been housed with cellmates at all. (*Id.* ¶¶ 69, 86.) Plaintiffs allege that Defendants were aware, at the time of his booking on September 9, 2022, that Mr. Staron posed a substantial risk to other detainees. (*Id.* ¶¶ 57, 68–69.) First, Mr. Staron was detained on charges of first-degree murder after stabbing a homeless man to death without any apparent motive and after exiting his residence with a shotgun and a pocketknife. (*Id.* ¶ 56–63.) His arrest history included charges for resisting arrest, trespass, and drug and alcohol offenses. (*Id.*) Second, Mr. Staron was six feet tall and 200 pounds at the time of his booking. (*Id.*) Third, Mr. Staron was evaluated by prison medical personnel as having a mental disorder and opioid dependence, was prescribed various psychiatric medications, and a

3

psychiatric follow-up was requested. (*Id.*) Despite this, Mr. Staron was cleared for release into the general population, and his medium security level score was not overridden. (*Id.* ¶¶ 63, 66.) Further, Plaintiffs allege, upon his entry into the general population, Mr. Staron demonstrated the risk he posed to his fellow detainees: he exhibited paranoid behavior, assaulted multiple inmates, and yelled about not receiving his medication, all of which was reported to staff. (*Id.* ¶¶ 73–76.) Mr. Staron's previous cellmate was also reassigned to another cell, at the cellmate's request, based on his fear that Mr. Staron would harm him. (*Id.* ¶ 81.)

Mr. Gantt was assigned to Mr. Staron's cell on September 30, 2022, eight or nine days before his death. (*Id.* ¶¶ 85, 89, 102.) On the evening of October 8, 2022, at approximately 7:21pm, Mr. Gantt and Mr. Staron were secured in their cell for the night. (*Id.* ¶ 89.) Plaintiffs allege that "according to CO Defendant Olabisi Asekere, she last verified that Mr. Gantt was alive at approximately 11:30pm when she shook his leg." (*Id.* ¶ 95.) Inmates from the dorm heard loud noises coming from Mr. Gantt and Mr. Staron's cell "during the evening and early morning hours," but no CO responded to the disturbance. (*Id.* ¶¶ 96–97.) On the morning of October 9, 2022, an inmate handing out breakfast alerted COs to Mr. Gantt's condition, and he was pronounced dead at 6:50am. (*Id.* ¶¶ 98, 102.) An autopsy confirmed that Mr. Gantt died of asphyxia due to strangulation (*id.* ¶ 103) and in October 2024, Mr. Staron pled guilty to the first-degree murder of Mr. Gantt (*id.* ¶ 108).

Plaintiffs allege that the CO Defendants and Supervisor Defendants failed to properly supervise Mr. Gantt's dorm on the night of his death. (*Id.* ¶¶ 111–22.) CO Defendants Asekere, Falokun, and Lewis were working in the dorm where Mr. Gantt and Mr. Staron were housed on the night of October 8, 2022—all three worked from 3pm to 11pm, and Asekere worked alone from 11pm to 7am, despite the fact that there should have been two COs working in light of an

4

ongoing lockup tier on the dorm. (*Id.* ¶¶ 91–94.) Supervisor Defendant Ebisike was the officer in charge, and Supervisor Defendant Griffin was the shift commander (*id.* ¶¶ 100–101), and Plaintiffs allege that all five Supervisor Defendants collectively failed to ensure that the dorm was properly staffed during the 11pm to 7am shift. (*Id.* ¶ 117.) Plaintiffs also allege that no COs were present inside the dorm when Mr. Gantt was murdered: "[h]ad an officer been present, he or she would have heard the disturbance and intervened." (*Id.* ¶ 112.) Further, at times between 3pm and 7am, the officer's desk—where an officer was required to be physically present—was abandoned. (*Id.* ¶ 113.) And between 11pm and 7am, the CO Defendants failed to make reasonable and/or required security rounds of the relevant dorm. (*Id.* ¶ 114.) The Supervisor Defendants were aware that COs, including the CO Defendants, were not performing reasonable and/or required security rounds, but did not respond with any corrective action. (*Id.* ¶ 116.)

More generally, Plaintiffs allege that "Defendants failed to have a proper system in place" to safely monitor disabled inmates like Mr. Gantt or to enable them to communicate if they needed help so that an officer could timely respond. (*Id.* ¶¶ 120–21.) Not only did this cause Mr. Gantt's death (*id.* ¶ 122), but it was part of a "custom, pattern, and practice of [DPSCS] failing to provide reasonable accommodation to detainees with disabilities at its detention facilities," especially Central Booking (*id.* ¶¶ 148–49). As part of this alleged pattern or practice, Plaintiffs describe findings that have been made in the context of ongoing enforcement of a 2016 consent decree[3] that resolved separate litigation first filed in this District in the 1970s.[4] Plaintiffs allege that a medical monitor appointed to evaluate Central Booking's compliance with the terms of that decree "ha[s] consistently demonstrated [since 2016] a failure of DPSCS to implement the provisions of the *Duvall* agreement," which "includes a requirement that inmates with disabilities at Central

---

[3] *See Duvall v. Moore*, Civ. No. MJM-94-2541, 2024 WL 4529261 (D. Md. Oct. 18, 2024).
[4] *See Duvall v. O'Malley*, Civ. No. ELH-94-2541, 2016 WL 3523682 at *2–5 (D. Md. June 28, 2016).

5

Booking be provided with appropriate housing." (*Id.* ¶¶ 150–51.) Specifically, Plaintiffs allege that the medical monitor found in October 2022—just days before Mr. Gantt was killed—"that inmates with disabilities were not appropriately monitored." (*Id.* ¶¶ 151, 155.) And in October 2023, the monitor allegedly found that Central Booking's lack of specialized housing for disabled detainees was particularly impactful on certain categories of detainees, including deaf detainees. (*Id.* ¶ 157.) In October 2024, Judge Maddox found that "[o]ver the last eight years of monitoring, Defendants have achieved substantial compliance with only two of the ten substantive provisions of the [*Duvall*] Agreement" and that their compliance efforts "have continued to fall short." (*Id.* ¶ 153 n.13 (citing *Duvall*, 2024 WL 4529261, at *4).) Plaintiffs conclude that "Defendants were aware that the health and safety of inmates with disabilities were at risk at Central Booking during the time that Mr. Gantt was placed in the general population," and that their "prolonged inaction despite the known risks . . . constitutes deliberate indifference." (*Id.* ¶ 161.)

Plaintiffs also describe a "custom, pattern, and practice" of Defendants failing to address incidents of violence and death at Central Booking. (*Id.* ¶¶ 123–47.) Plaintiffs describe "alarming trends in inmate violence at Central Booking at the time Mr. Gantt was committed to the facility," which they allege Defendants were aware of. (*Id.* ¶ 130.) Despite this, and despite DPSCS and the Official Defendants knowing that this dangerous situation was created (in part) by staffing shortages, these Defendants failed to adequately staff Central Booking. (*Id.* ¶¶ 132, 135–37.) Similarly, Plaintiffs allege, Defendants were aware of "an alarming number of deaths at Central Booking indicating systemic issues in the facility's screening and supervision of its detainees," (*id.* ¶ 140), such as the 2019 death of a disabled man with the mental acuity of a 12 to 15 year old who died with morphine and fentanyl in his system (*id.* ¶ 142). Despite knowledge of these

6

incidents, Plaintiffs allege that DPSCS and the Official Defendants "failed to take any corrective action . . . to protect its detainees." (*Id.* ¶¶ 140, 146.)

Plaintiffs assert that as a result of Defendants' conduct, Mr. Gantt suffered damages in the form of physical pain, mental suffering and anguish, fear, and death, and that Plaintiffs themselves, as his family members, have suffered severe mental distress. (*Id.* ¶¶ 162–66.)

### B.    Procedural Background

Plaintiffs are Mr. Gantt's parents and the mother of his minor child: Rick Barry Sr. is Mr. Gantt's father and the personal representative of Mr. Gantt's estate, Quinette Buadu is Mr. Gantt's mother, and Tamia Singleton is the mother and next friend of Mr. Gantt's minor daughter, J.G. (*Id.* ¶¶ 10–12.) Defendant DPSCS is a department of the Maryland state government, which is sued in addition to ten individuals: two Official Defendants (Robert L. Green and Dionne Randolph), sued in both their individual and official capacities; five Supervisor Defendants (Gerald Ebisike, Carol Griffin, Frederick Abello, Curtis Henson, and Keith Dickens), sued in their individual capacities; and three CO Defendants (Olabisi Asekere, Ayodele Falokun, and Christopher Lewis), also sued in their individual capacities. (*Id.* ¶¶ 13–25.) Plaintiffs also sue an unspecified number of "Custody Does," whose identities are unknown but who served as supervisors, correctional officers, and/or staff at Central Booking at the time of the pertinent events. (*Id.* ¶ 24.)

Plaintiffs assert ten claims for relief. Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, asserts six counts: for constitutional violations pursuant to 42 U.S.C. § 1983 (Counts I and II), violation of Article 24 of the Maryland Declaration of Rights (Count III), gross negligence (Count IV), a *Longtin* pattern or practice of violating the Maryland Declaration of Rights (Count V), and survival (Count VI). In addition, each Plaintiff individually asserts a claim

for wrongful death (Counts VII–IX). Finally, all Plaintiffs assert a claim for indemnification (Count X).

All Defendants except CO Defendant Asekere are represented by counsel for the State of Maryland (the "Represented Defendants") and have moved to dismiss the majority of Plaintiffs' claims against them, or in the alternative, for summary judgment. (ECF No. 16.) The exceptions are Count VI, for survival, and Counts VII–IX, for wrongful death, which Defendants do not argue must be dismissed against DPSCS and the Official Defendants in their official capacity.[5] (*Id.*) CO Defendant Asekere—proceeding pro se because "[t]he Attorney General's office declined to represent" her (ECF No. 32 ¶ 21)—has moved to dismiss all claims against her. (ECF No. 22.) Defendants seek dismissal pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted—or, in the alternative, pursuant to Rule 56, because there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

## III. Legal Standards

When considering a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). Viewed through that lens, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 662. A

---

[5] The Represented Defendants do, however, argue that these counts should be dismissed against all Defendants in their individual capacities. *See* Section III.A.4. *infra.*

8

"pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555, 557). However, a plaintiff need not include "detailed factual allegations," *Twombly*, 550 U.S. at 555, and federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

To prevail on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In proving the presence or absence of a genuine dispute, either party may point to materials in the record, such as admissions, stipulations, depositions, documents, and electronically stored information. Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the movant meets this burden, then the nonmoving party cannot rest on mere denials but must point to specific facts showing there is a genuine triable issue in the case. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). In determining whether a genuine dispute of material fact exists, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

9

In evaluating a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), or in the alternative for summary judgment pursuant to Rule 56, Rule 12(d) applies. Fed. R. Civ. P. 12(d). Under Rule 12(d), if the Court, in ruling on the motion, considers materials outside the pleadings, then the motion must be construed as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present all the material that is pertinent. A nonmoving party can show that she has *not* had a reasonable opportunity to present all pertinent material—and that the Court must disregard materials outside the pleadings and construe the motion as seeking dismissal under Rule 12(b)(6)—by filing a Rule 56(d) affidavit showing that "for specified reasons," she "cannot present facts essential to justify [her] opposition." Fed. R. Civ. P. 56(d). However, a Rule 56(d) request for discovery may be properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874–75 (4th Cir. 2019).

## III. Analysis

Plaintiffs have filed a Rule 56(d) affidavit attesting that "Defendants, including Defendant [DPSCS], possess additional non-public information related to Mr. Gantt's death that can be obtained through discovery," and that "discovery will provide relevant information regarding [Plaintiffs'] claims, . . . including the staffing, roles, and responsibilities of correctional officers who were or should have been working at the time of Mr. Gantt's murder." (ECF No. 25-1 ¶¶ 5–6.) As discussed further where pertinent below, the Court finds these representations sufficient to establish that Plaintiffs cannot, without discovery, present facts essential to justify their opposition to Defendants' request for summary judgment. Thus, the Court will construe Defendants' filings

10

as motions to dismiss, disregard the materials outside the pleadings, and assess whether the factual allegations in Plaintiffs' complaint are sufficient to state a claim for relief under Rule 12(b)(6).

### A. Claims Against the Individual Defendants

#### 1. § 1983 (Count I)

Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, pleads two counts against the Individual Defendants under 42 U.S.C. § 1983. Count I alleges that the Supervisor Defendants, the CO Defendants, and the Custody Does failed to protect Mr. Gantt in violation of the Fourteenth Amendment—they exhibited deliberate indifference to a known excessive risk that Mr. Gantt would be harmed. (ECF No. 2 at 29–30.) The Represented Defendants argue this claim must be dismissed for several reasons. (ECF No. 16-1 at 8–19.) Count I will survive against the CO Defendants (Asekere, Falokun, and Lewis), but will be dismissed against the Supervisor Defendants (Ebisike, Griffin, Abello, Henson, and Dickens) and the Custody Does.

#### a. Deliberate Indifference

The Fourteenth Amendment Due Process Clause protects pretrial detainees from governmental action that is not "rationally related to a legitimate nonpunitive governmental purpose" or that is "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). 42 U.S.C. § 1983 permits a pretrial detainee to assert a Fourteenth Amendment due process violation based on a state official's failure to protect the detainee from attack by another detainee. *Prigg v. Baltimore Cnty. Dep't of Corr.*, Civ. No. DLB-23-48, 2024 WL 1012885, at *5 (D. Md. Mar. 8, 2024). A failure to protect claim under the Fourteenth Amendment has two elements: that a defendant exposed a detainee to "an objectively substantial risk of serious harm," and that the defendant exhibited "deliberate indifference" to that risk. *Hammock v. Andoh*, Civ.

11

No. DLB-21-796, 2025 WL 2402198, at *4 (D. Md. Aug. 19, 2025) (quoting *Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023)) (internal quotation marks omitted).

Applying the Supreme Court's teaching in *Kingsley*, the Fourth Circuit has held that the standard for deliberate indifference in such cases is "purely objective." *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024). That is, "[t]o meet the [deliberate indifference] prong, the detainee must show that 'the defendant's action or inaction was . . . objectively unreasonable.'" *Hammock*, 2025 WL 2402198, at *4 (quoting *Short*, 87 F.4th at 611). "[A]s the Supreme Court put it when describing civil recklessness, . . . it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Short*, 87 F.4th at 611 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). It is not enough, by contrast, "for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611–12. "Recklessness is a lower bar than intent, but a higher bar than negligence." *Id.* at 611.

The Represented Defendants argue that Count I fails to state a claim of deliberate indifference: "Plaintiffs lump all Defendants together, without attributing any specific conduct to any individual officer. . . . [and] do[] not describe any 'objectively unreasonable' or irresponsible actions of any Defendant." (ECF No. 16-1 at 16.) The Court considers each category of the Count I Defendants in turn.

As to the three CO Defendants, the Court finds that Plaintiffs have plausibly pled that these Defendants were deliberately indifferent to an objectively substantial risk that Mr. Gantt would be seriously harmed. Plaintiffs allege that the CO Defendants knew that Mr. Gantt was especially vulnerable and that Mr. Staron was especially violent, but they nonetheless failed to be present in the dorm, abandoned the officer's desk on the tier, and/or failed to make required security rounds,

12

all while Mr. Gantt and Mr. Staron were secured in their cell together. Worse than merely failing to respond to the threat Mr. Staron posed against Mr. Gantt, the CO Defendants are alleged to have exascerbated that risk considerably by failing to perform their basic duties in accord with required protocols. Such conduct was objectively unreasonable under the circumstances—not merely negligent or accidental, but enough to constitute deliberate indifference to the obvious risk. *See Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015) (where an "undisputedly vulnerable [detainee] shared a cell with an undisputedly aggressive [detainee]," it can be obvious that "this continued arrangement constitute[s] a substantial risk of serious harm," and "d[oing] nothing" in response can therefore constitute deliberate indifference); *Burton v. Matti*, Civ. No. RDB-24-2445, 2025 WL 3562585, *5 (D. Md. Dec. 12, 2025) (finding deliberate indifference plausibly pled where officers in charge of a murdered detainee's housing unit failed to properly staff their posts at the time of the attack).

Defendants' arguments to the contrary are unavailing. For one thing, the Represented Defendants argue that the COs were not "responsible for case management decisions, which would include where and with whom an inmate was placed for housing, as well as when and where an inmate could be reassigned to different housing or another cell mate," and they cite affidavits from CO Defendants Falokun and Lewis to this effect. (ECF No. 16 at 12–13; ECF Nos. 16-3, 16-4.) CO Defendant Asekere echoes these assertions in her motion, claiming that she "had no role in [Mr. Gantt's] placement [or] classification . . . ." (ECF No. 22 at 3.) But *Makdessi* and *Farmer* suggest these facts, even if true, are insufficient to shield the CO Defendants from liability, and in any event, Plaintiffs' Rule 56 affidavit (ECF No. 25-1) establishes Plaintiffs' entitlement to conduct discovery on these points.

13

More substantially, the Represented Defendants argue that the claims against CO Defendants Falokun and Lewis in particular must be dismissed because—unlike CO Defendant Asekere—neither of them "was working at the time of Mr. Gantt's death." (ECF No. 16-1 at 13; *see also* ECF No. 31 at 1–4.) Falokun and Lewis argue that pursuant to the facts alleged in Plaintiffs' own complaint, Mr. Gantt must have died *after* 11pm on October 8, when CO Defendants Falokun's and Lewis' shifts ended. (*Id.*) After all, the complaint alleges that "[a]ccording to [CO] Defendant Asekere, she last verified that Mr. Gantt was alive at approximately 11:30pm" (ECF No. 2 ¶ 95) and that "inmates from the dorm heard loud noises coming from Mr. Gantt's cell during the evening *and early morning* hours" (*id.* ¶ 96 (emphasis added)). If CO Defendants Falokun and Lewis were not working when Mr. Gantt was attacked, Defendants suggest, then it cannot be any failure of theirs that was responsible for Mr. Gantt's death.

However, the facts alleged in the Complaint, when viewed in the light most favorable to the Plantiffs, do not make clear whether Mr. Gantt was killed during the 11pm to 7am shift, when only CO Defendant Asekere was working, or the 3pm to 11pm shift, when all three CO Defendants were on duty. (*See* ECF No. 25 at 17.) The complaint is internally inconsistent as to the time that inmates heard Mr. Gantt grunting and kicking at his cell door: Plaintiffs do allege that it was heard "during the evening *and* early morning hours" (ECF No. 2 ¶ 96 (emphasis added)), but also that it was "during the night of October 8 *or* early morning of October 9" (*id.* ¶ 2 (emphasis added)). Considering the complaint as a whole, the Court understands Plaintiffs to be asserting that the noise was heard in the evening *and/or* the early morning, which is consistent with it having been heard before the shift change at 11pm. Similarly, the Complaint does not embrace the assertion that Mr. Gantt was indeed alive at 11:30pm, but only that *CO Defendant Asekere asserted* that he

14

was. (*Id.* ¶ 95.) Interpreting these allegations in Plaintiffs' favor, the Court finds that Plaintiffs may sensibly maintain that "the exact time that Mr. Staron murdered Mr. Gantt is unknown, and could have been during Defendants Falokun and Lewis' purported shifts." (ECF No. 25 at 17.) Defendants' assertions to the contrary therefore do not warrant dismissal of Count I against them.

Next, as to the five Supervisor Defendants, the Court will dismiss Count I because Plaintiffs do not allege that any of these Defendants personally participated in the underlying constitutional violation. Rather, the conduct of these Defendants is best assessed under a theory of supervisory liability, which Plaintiffs allege in Count II, and which the Court addresses in Section III.A.2. *infra.*

Finally, as to the Custody Does, the Court will dismiss Count I without prejudice. "The designation of a John Doe defendant is generally not favored in the federal courts." *Chidi Njoku v. Unknown Special Unit Staff*, Civ. No. 99-7644, 2000 WL 903896, at *1 (4th Cir. July 7, 2000) (unpublished table decision). At minimum, unnamed defendants must be "real, but unidentified." *Schiff v. Kennedy*, 691 F.2d 196, 197 (4th Cir. 1982). Here, Plaintiffs allege that the Custody Does "are supervisors, correctional officers, and other staff employed at Central Booking at the time of the events giving rise to this complaint." (ECF No. 2 ¶ 24.) But Plaintiffs have not made any specific nonconclusory allegation against these unidentified figures. Given this, there is no basis to conclude that defendants are, in fact, real. *See Pair v. Alexander*, Civ. No. GLR-16-1492, 2018 WL 1583472, at *1 n.2 (D. Md. Apr. 2, 2018). Accordingly, Count I will be dismissed without prejudice against the Custody Does, as will all other claims asserted against them. *See Attkisson v. Holder*, 925 F.3d 606, 628 (4th Cir. 2019).

15

### b.    Qualified Immunity

The Represented Defendants also argue that Count I should be dismissed because all the Defendants who are sued in the individual capacities are entitled to qualified immunity: "Absent from the Complaint are any plausible factual allegations that any defendant engaged in conduct that a reasonable correctional official would have recognized as violating a 'clearly established' right under the Fourteenth Amendment." (ECF No. 16-1 at 16–19.)

Qualified immunity is an affirmative defense to liability where a defendant "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Case v. Beasley*, 167 F.4th 651, 662 (4th Cir. 2026) (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)). Typically, "[d]etermining whether qualified immunity is appropriate is a two step inquiry." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right." *Id.* "Second, the court must consider whether the right at issue was 'clearly established' at the time of the alleged misconduct." *Id.* Having concluded above that Plaintiffs have alleged a violation of a constitutional right, the second step in the inquiry is at issue here.

Whether a right was clearly established depends on whether the law "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The contours of the constitutional right "must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Hope*, 536 U.S. at 753 (quotation omitted). In determining "whether a given right was clearly established," the court must "define that right at a high level of particularity," *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (citations

16

omitted), and "refer to concrete applications of abstract concepts," *Knussman v. Maryland*, 272 F.3d 625, 638 n.9 (4th Cir. 2001) (citation omitted). If the right is defined "too general[ly]," state officials will lack "adequate guidance on the constitutional limits to their conduct." *Knussman*, 272 F.3d 625 at 638 n.9.

The Represented Defendants argue:

> Defined with the 'high level of particularity' required by *Campbell*, . . . Plaintiffs' claims would demand the defendants recognize a constitutional requirement that Mr. Gantt be classified at a low security level and not assigned to general population housing or celled with another detainee who could be "violent" or have mental health issues. . . . There is no such constitutional right in existence, much less one that is clearly established such that Defendants would understand its application to Mr. Gantt.

(ECF No. 16-1 at 18–19.)  Plaintiffs respond that the right at issue is Mr. Gantt's Fourteenth Amendment right to be protected from a substantial and known risk of harm inflicted by a fellow detainee, and that this right has long been clearly established. (ECF No. 25 at 19 (citing *Wynn v. Perry*, Civ. No. 3:14-625-FDW, 2018 WL 1077321, at \*25 (W.D.N.C. Feb. 27, 2018)).)

In the Court's view, while the right in question must be defined "in light of the specific context of the case [and] not as a broad general proposition," "[i]t is not necessary [ ] that 'the exact conduct at issue' have been previously held unlawful; 'rather, our analysis must [also] take into consideration . . . [rights] manifestly included within more general applications of the core constitutional principle invoked.'" *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016) (citing *Odom v. S.C. Dept. of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003)). The Fourth Circuit's recent decision in *Case v. Beasley*, 167 F.4th 651 (4th Cir. 2026), is particularly instructive on the appropriate level of generality at which to analyze Mr. Gantt's constitutional right.

In *Case*, correctional officers allegedly failed to protect an inmate from a violent fellow prisoner by leaving open doors that should have been closed. 167 F.4th at 657–58. In analyzing the officers' entitlement to qualified immunity, the Fourth Circuit found *Cox*—which involved

17

correctional officers failing to protect an inmate by relaying his complaints about other inmates to those inmates themselves—to be "on all fours." *Id.* at 663. Despite the factual difference in the conduct that was challenged, the Fourth Circuit held that the officers in both cases "were on notice that their actions were likely to increase a known and substantial risk of serious harm of violence by other incarcerated individuals . . . [y]et the officers aggravated the risk of harm." *Id.* This aggravation was the unconstitutional conduct at issue, and because it "was clearly established" as unconstitutional when the *Case* officers acted, they were not entitled to qualified immunity. *Id.*

So too here. By October 2022 when the events at issue took place, it was clearly established—by *Cox*—that a correctional officer violates a pretrial detainees's Fourteenth Amendment rights when his objectively unreasonable conduct aggravates a known and substantial risk of serious harm of violence by another detainee. Here, Mr. Gantt's right was allegedly violated by the CO Defendants because they knew Mr. Gantt was especially vulnerable, knew he was housed with another detainee with a history of violence (both preceding and during his detention), and yet aggravated the resulting obvious risks by failing to monitor them in accordance with required policies. The CO Defendants cannot be credited with any reasonable misapprehension that abandoning their post or failing to conduct required rounds might be lawful under the circumstances; rather, they had fair notice of the unconstitutionality of their conduct. Dismissal based on qualified immunity is therefore not warranted.

### 2.    § 1983 Supervisory Liability (Count II)

Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, pleads a second § 1983 count on a theory of supervisory liability, alleging that the responses of the Supervisor Defendants and the Official Defendants (in their personal capacities) constituted deliberate indifference to their knowledge of their subordinates' conduct, and to the systemic problems at

18

Central Booking. (ECF No. 2 at 31–32.) The Represented Defendants move to dismiss. (ECF No. 16-1 at 8–19.) Count II will survive.

Supervisors are not subject to vicarious liability under § 1983. A supervisor's "mere knowledge" that subordinates have engaged in unconstitutional acts does not give rise to liability; rather, a supervisor "is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Supervisory liability under § 1983 "is premised on a 'recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

> [T]o establish supervisory liability under § 1983, a plaintiff must demonstrate: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). At the pleading stage, alleging that a supervisor knew about misconduct of his or her subordinates and failed to act can suffice to state a plausible claim for supervisory liability. *See Shipley v. Disney*, Civ. No. SAG-21-3173, 2022 WL 2789076, at *9 (D. Md. July 15, 2022).

The Represented Defendants argue that Count II fails to state a claim: "Plaintiffs do not allege that [the Official Defendants] had any personal knowledge of the circumstances of Mr. Gantt's confinement, much less assigned him his security level, decided where to house him, were in Central Booking when the assault occurred, or otherwise had any personal knowledge that Mr. Gantt was in danger." (*Id.* at 9.) Further, Defendants argue, "Plaintiffs make no specific allegations

19

as to any [Supervisor] Defendant or either [of the Official] Defendant[s]. Lumping all of these defendants together, . . . Plaintiffs assert [only] a series of general allegations." (*Id.* at 16.)

Plaintiffs allege that all five of the Supervisor Defendants had responsibility for security at Central Booking: Abello was the Warden, Henson was the Chief of Security, Dickens was the Director of Security Operations, and, as discussed above, on the night of Mr. Gantt's murder, Ebisike was a Sergeant in charge of the tier officers and Griffin was a shift commander in charge of the COs. (ECF No. 2 at ¶¶ 16–20.) The Official Defendants Green and Randolph were the Secretary and Commissioner of DPSCS, respectively, and shared responsibility for overseeing the agency's compliance with law and ensuring adequate staffing and training. (*Id.* ¶¶ 14–15.)

Plaintiffs allege that both the Supervisor Defendants and the Official Defendants "had knowledge of the agency's failures to comply with state and federal law in housing detainees with detainees with disabilities at Central Booking." (*Id.* ¶ 159.) "At the time that Mr. Gantt entered Central Booking, [the Official Defendants] knew that disabled detainees in the general population were not appropriately monitored at the facility" (*id.* ¶ 156) given an October 2022 finding "issued just days before Mr. Gantt was murdered, [which] confirmed that inmates with disabilities were not appropriately monitored" (*id.* ¶ 155). And the Official Defendants "were aware that staffing shortages at Central Booking were creating a dangerous environment for detainees [and that] the agency had failed to address the unsafe staffing levels" (*id.* ¶¶ 135–36). Despite this, the Official Defendants "took no corrective action." (*Id.* ¶ 121.)

Further, the Supervisor Defendants allegedly "knew or should have known about the improper override of Mr. Gantt's calculated security level" in particular (*id.* ¶ 51) and "were aware that [Mr. Staron] posed a substantial risk to other inmates [and] should have been closely monitored" (*id.* ¶ 68). The Supervisor Defendants "were aware that correctional officers, including

20

CO Defendants, were not performing reasonable and/or required security rounds during their shifts . . . [and] failed to take any corrective action" (*id.* ¶ 116) and the Supervisor Defendants "failed to take any corrective action to ensure that [Mr. Gantt's] dorm was properly staffed during the shift that Mr. Gantt was murdered" (*id.* ¶ 117).

Taken together and viewed in the light most favorable to the Plaintiffs, these allegations suffice to state a claim of supervisory liability against the Supervisor Defendants and Official Defendants alike—they make plausible that each of these Defendants showed deliberate indifference to, or tacit authorization of, practices of their subordinates which posed a pervasive and unreasonable risk of constitutional injury to detainees like Mr. Gantt and which contributed causally to Mr. Gantt's death. The Court is mindful that "[a]s liability . . . is personal, a complaint must contain specific allegations of each individual's conduct and state of mind," *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023), and that Plaintiffs must make factual allegations in support of their claim that a practice posing a pervasive risk existed, *Shipley*, 2022 WL 2789076, at *9. On summary judgment or at trial, the Court would expect Plaintiffs to present fulsome evidence as to each Individual Defendant's state of mind with respect to the previous failures that are pled and further specifics as to prior instances where those failures caused constitutional injury. But at the pleading stage, the Court is persuaded that the Fourth Circuit requires no more than what Plaintiffs have provided here: each of the Supervisor and Official Defendants are alleged to have been aware of ongoing failures to monitor disabled detainees, ongoing failures to staff Central Booking appropriately, and/or ongoing failures of subordinates to conduct required rounds, and specific examples of such failures are described in the complaint, even if somewhat briefly. Each Supervisor and Official Defendant allegedly failed to take corrective action in response to these failures despite having job responsibilities that—drawing favorable inferences—plausibly

required them to do so. Plaintiffs have alleged enough to have stated a claim that these failures to take corrective action constituted tacit authorization and/or condonation of the alleged practices, which in turn served as a "causative factor" in Mr. Gantt's death. *See Shipley,* 2022 WL 2789076, at *12 ("[A]t the pleading stage, there is no requirement that the plaintiff plead the multiple incidents of constitutional violations that may be necessary at later stages to establish causation.") (citation omitted).

The Court rejects Defendants' assertion that Plaintiffs merely "cobble[ ] together bits of hindsight and unsupported allegations" (ECF No. 31 at 6–7) to allege supervisory liability. And the Court finds Plaintiffs' reliance on *Baynard* and *Shipley* apt despite the factual differences Defendants highlight in their reply. Those cases do not impose a requirement, as Defendants suggest, that a supervisor's knowledge of prior misconduct must include misconduct involving the plaintiff in particular. Rather, both cases impose the standard the Court imposes here, asking whether "supervisory indifference or tacit authorization of subordinates' misconduct [was] a causative factor in the [Plaintiff's] constitutional injuries," *Baynard,* 268 F.3d at 235—a standard that can be plausibly pled even where the prior misconduct involved victims other than the plaintiff. *See Shipley,* 2022 WL 2789076, at *12 (citing cases denying motions to dismiss *Monell* claims that, as discussed below, are evaluated by reference to the same standard as individual supervisory liability claims).

So too the Court rejects Defendants' arguments that the Supervisor Defendants and Official Defendants are entitled to qualified immunity, for the same reasons as those discussed above—the constitutional rights at issue, evaluated at the appropriate level of generality, were indeed clearly established when they were allegedly violated in October 2022. *See Shaw,* 13 F.3d at 799 ("A supervisor's continued inaction in the face of documented widespread abuses [ ] provides an

22

independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.") (quoting *Slakan*, 737 F.2d at 372–73). Thus, Count II will survive.

### 3.    Article 24 (Count III)

Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, also pleads a violation of Article 24 of the Maryland Declaration of Rights against the Individual Defendants. (ECF No. 2 at 32.) The Represented Defendants argue that this claim should be dismissed for the same reasons as the § 1983 claims, explaining that "the Fourteenth Amendment and Article 24 are read *in pari materia.*" (ECF No. 16-1 at 19.) Plaintiffs agree that "Article 24 of the Maryland Constitution provides the same protections as the Fourteenth Amendment," and they argue that "Count III states claims under Article 24 for the same reasons Counts I and II state claims under § 1983." (ECF No. 25 at 18.) The Court therefore finds, for the same reasons that are discussed above, that Plaintiffs have stated a claim under Article 24.

The Represented Defendants also advance one argument for dismissing the Article 24 claim which would not apply to the § 1983 claims—in particular, that the Maryland Tort Claims Act and/or Maryland common law entitle them to qualified immunity and/or public official immunity because their conduct was not grossly negligent or malicious. (ECF No. 16-1 at 20–24.) This argument applies equally to all of the state law claims advanced against the Individual Defendants (Counts III, IV, and VII–IX) and is discussed further (and rejected) below. Thus, Count III will survive.

### 4.    Gross Negligence (Count IV) and Wrongful Death (Counts VII–IX)

In Count IV, Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, pleads gross negligence against all of the Individual Defendants. (ECF No. 2 ¶¶ 190–95.) The

Represented Defendants argue that this claim should be dismissed because Plaintiffs plead only a "failure to comply with professional standards of care and DPSCS policies, which is not enough" to constitute the "extraordinary or outrageous" conduct required for gross negligence. (ECF No. 16-1 at 20–22.) Relatedly, the Represented Defendants argue that because Plaintiffs fail to state a claim for gross negligence (and because they similarly fail to state a claim for malice), the Individual Defendants are entitled to qualified immunity under the Maryland Tort Claims Act ("MTCA") and/or public official immunity under the Maryland common law—immunity which requires the dismissal of not only the gross negligence claim itself (Count IV), but *all* of the state law claims that are advanced against them (also including Count III, for violation of Article 24, and Counts VII-IX, for wrongful death). (ECF No. 16-1 at 20–24.)   The Court rejects both arguments.

Under the MTCA, "state employees are protected from liability by state sovereign immunity for tortious acts or omissions that are within the scope of their employment, unless those actions were made with malice or gross negligence." *MedSense, LLC v. Univ. Sys. of Md.*, 420 F. Supp. 3d 382, 397 (D. Md. 2019) (citing Md Code Ann., Cts. & Jud. Proc. § 5-522(b), State Gov't § 12-105). Maryland common law also recognizes public official immunity, which applies when (1) the actor is a public official (2) whose tortious conduct occurred while performing discretionary acts in furtherance of his duty. *Rodwell v. Wicomico Cnty.*, Civ. No. DKC 22-3014, 2024 WL 1178202, at *6 (D. Md. Mar. 19, 2024). Public official immunity, like the MTCA's qualified immunity, does not shield acts committed with malice or gross negligence, nor does it apply to state constitutional torts. *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 297 (D. Md. 2020).

Gross negligence under Maryland law consists of "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another,

24

and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Albero v. Worcester Cnty. Bd. of Comm'rs*, Civ. No. JKB-24-1100, 2025 WL 462588, at *18 (D. Md. Feb. 11, 2025) (quoting *Cooper v. Rodriguez*, 118 A.3d 829, 844–46 (Md. 2015)). Gross negligence may arise either from intentional infliction of harm or utter indifference to the rights of others. *Id.* As this Court has previously held, "the gross negligence standard [is] essentially equivalent to that for civil recklessness—the same standard that, as discussed above, governs pretrial detainees' rights under the Fourteenth Amendment." *Id.* (citing federal and state courts alike applying the gross negligence standard in this manner); *see also Farmer*, 511 U.S. at 836 n.4 (calling "gross negligence" a "nebulous" term that "in practice typically mean[s] little different from recklessness as generally understood in the civil law") (citing W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984)).

Defendants are surely right that "the [mere] failure to adhere to protocols and policies does not itself establish a reckless disregard for human life or amount to gross negligence." *Est. of Green v. City of Annapolis*, Civ. No. MJM-24-1351, 2025 WL 1029555, at *20 (D. Md. Apr. 7, 2025) (quoting *Stracke v. Est. of Butler*, 214 A.3d 561, 571 (Md. 2019) (citations omitted)). But as discussed above, Plaintiffs allege more than just that. Rather, Plaintiffs allege conduct that is objectively unreasonable in the sense required for civil recklessness—Defendants' failures to follow protocol stood "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 611 (citation omitted). Such utter indifference can constitute gross negligence, and accordingly, Count IV will survive.

Given that Plaintiffs have stated a claim of gross negligence, dismissal of Plaintiffs' state law claims (Counts III, IV, and VII-IX) against the Individual Defendants is not now warranted on grounds of state qualified and/or public official immunity. Defendants offer no basis for

25

dismissal of these claims beyond those that are discussed above, and thus, these Counts will survive against the Individual Defendants.

## B. Claims Against DPSCS and the Official Defendants in their Official Capacity

### 1. *Longtin* Pattern or Practice (Count V)

Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, pleads a *Longtin* pattern or practice claim against DPSCS for violations of the Maryland Declaration of Rights. (ECF No. 2 ¶¶ 196–201.)

> [T]hese patterns or practices included failing to adequately protect the safety of detainees, failing to train employees to properly screen detainees for risk of victimization or risk of abusiveness, failing to train staff to properly screen and monitor detainees with mental health concerns, failing to adequately staff its facilities, failing to properly monitor detainees, failing to provide safe housing for vulnerable detainees, and failing to provide appropriate accommodations to disabled inmates.

(*Id.*) The Represented Defendants move to dismiss, arguing that "Plaintiff[s] ha[ve] failed to identify and provide support for 'the specific unconstitutional pattern or practice' that allegedly 'resulted in' Mr. Gantt's death." (ECF No. 16-1 at 24–27.) The Court disagrees, and Count V will survive.

"[T]he Maryland Constitution recognizes a 'pattern or practice' claim as part of its protections of citizens against unconstitutional actions of local government and its employees." *Prince George's Cnty. v. Longtin*, 19 A.3d 859, 889 (Md. 2011).[6] A *Longtin* pattern-or-practice claim is an "analogue to a [federal] *Monell* claim" and "[t]his court routinely analyzes *Monell* and

---

[6] The parties' briefs both cited law that "an unconstitutional pattern or practice claim—a *Longtin* claim—may be brought against the State." (*See* ECF Nos. 16-1 at 24, 25 at 27 (citing *State v. Young*, 333 A.3d 610, 624 (App. Ct. Md. 2025)).) Though Defendants' brief does not explicitly preserve any argument to the contrary, and neither party filed a Notice of Supplemental Authority, the Court recognizes that after the briefs were filed, the Supreme Court of Maryland vacated the holding cited from *Young*. No. 27, Sept. Term, 2025, 2026 WL 1801178, at *16 (Md. June 23, 2026).

26

*Longtin* claims together." *Doe v. Anne Arundel Cnty.*, Civ. No. 1:23-03451-JRR, 2025 WL 675059, at *8 (D. Md. Mar. 3, 2025).

To prevail on a *Longtin* claim, a plaintiff must establish that (1) the government entity maintained an unconstitutional pattern or practice, and that (2) the specific unconstitutional pattern or practice resulted in the plaintiff's injury. *Young*, 333 A.3d at 626. Establishing the required pattern or practice for a *Monell/Longtin* claim is difficult, but can be done under any of four distinct factual theories:

> (1)    through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted). "*Monell* claims survive the motion to dismiss stage if the plaintiff alleges facts to support that the defendant was aware of ongoing constitutional violations and did nothing to stop or correct those actions." *Anne Arundel Cnty.*, 2025 WL 675059, at *9 (citation omitted).

A *Longtin* pattern-or-practice claim advanced under a failure to supervise theory is assessed under the same standard as a personal capacity supervisory liability claim. *Anne Arundel Cnty.*, 2025 WL 675059, at *11 (citing *Shipley*, 2022 WL 2789076, at *8). In other words, a plaintiff must allege "(1) that the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) an affirmative causal link between the supervisor's inaction and the plaintiff's alleged constitutional injury." *Id.* (citations omitted). Thus, for the same reasons that the Court has concluded above that Plaintiffs

27

state a claim for personal capacity supervisory liability against the Supervisor and Official Defendants (in their personal capacities) (*see* Section III.A.2. *supra*), so too the Court finds that Plaintiffs have stated a *Longtin* claim against DPSCS.

Similarly, to state a *Monell/Longtin* claim based on a condonation theory, "[a] plaintiff must point to a persistent and widespread practice[ ] of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens v. Balt. City State's Attys. Off.*, 767 F.3d 379, 402 (4th Cir. 2014). The Court further finds that the same allegations that suffice to state Plaintiffs' *Longtin* claim on a failure to supervise theory also state a claim on a condonation theory.

The Represented Defendants rely principally on *State v. Young* in arguing that Plaintiffs have not adequately identified the required pattern or practice or connected it with Mr. Gantt's death. In *Young*, the Appellate Court of Maryland found, *post-trial*, that an injured inmate had not presented sufficient evidence to support a finding of a pattern or practice. 333 A.3d 610, 628 (App. Ct. Md. 2025), *reversed in part and vacated in part,* No. 27, Sept. Term, 2025, 2026 WL 1801178, at *16 (Md. 2026). While Young introduced evidence that there had been prior incidents of a failure to protect inmates, they resulted from a failure to intervene in an attack, or the opening of a cell door, whereas Young showed that his own injury resulted from dangerous metal lockers and the inadequacy of the institution's staffing plan. *Id.* No evidence of prior instances concerning lockers or staffing was introduced at trial, and thus, the evidence was insufficient "to connect the specific failure of the State . . . with the previous instances of the failures to protect." *Id.*

The Court recognizes that Plaintiffs do not specifically allege that each of the prior instances of failure to protect detainees that they identify in the complaint shares each and every

28

feature of Mr. Gantt's situation. Nevertheless, the Court finds that the prior instances are alleged to have been sufficiently similar for the *Longtin* claim to survive at the motion to dismiss stage. As Plaintiffs rightly argue, "[a]t the pleading stage, there is no need to allege that DPSCS' failures resulted in other instances of violence against disabled detainees." (ECF No. 25 at 30 (citing *Johnson*, 452 F. Supp. 3d at 311).) "Before discovery, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers." (*Id.* at 28 (citing *Anne Arundel Cnty.*, 2025 WL 675059, at *10).) Plaintiffs describe prior instances of inmates housed together who plausibly should not have been (*see* ECF No. 2 ¶¶ 138, 139); findings that inadequate staffing created a safety risk at Central Booking (*id.* ¶¶ 132–34); and findings that other disabled inmates had not been properly monitored (*id.* ¶ 155). These prior incidents are plausibly connected to Plaintiffs' allegations that Mr. Gantt should not have been housed with Mr. Staron, that there was only one CO on duty during the 11pm to 7am shift (rather than the required two), and that Mr. Gantt was not properly monitored in light of the vulnerability that resulted from his disability. As noted above, the Court will certainly expect further detail and specificity concerning the alleged patterns and practices at later stages of the case, but for now, the allegations pled suffice to withstand Defendants' arguments for dismissal. Accordingly, Count V will survive.

### 2.    Survival (Count VI) and Wrongful Death (Counts VII–IX)

Plaintiff Barry, as the Personal Representative of Mr. Gantt's estate, pleads a survival action against DPSCS and the Official Defendants in their official capacity (Count VI). (ECF No. 2 at 34–35.) And each Plaintiff—Plaintiff Barry, individually, Plaintiff Buadu, and Plaintiff Singleton, as parent and next friend of minor J.G.—pleads a claim for wrongful death against DPSCS and the Official Defendants in their official capacity (in addition to certain Individual

29

Defendants, as discussed above) (Counts VII–IX).  The Defendants do not move for dismissal of these counts against DPSCS and the Official Defendants in their official capacity.  (*See* ECF No. 16-1.)  Thus, these claims will survive against these Defendants.

### 3.  Indemnification (Count X)

Finally, all Plaintiffs assert a claim for indemnification against DPSCS.  (ECF No. 2 at 38.) The Represented Defendants move to dismiss it (ECF No. 16-1 at 27–28), and Plaintiffs "acknowledge that indemnification is not a standalone claim and therefore do not contest dismissal." (ECF No. 25 at 18 n.6.)  Thus, this count will be dismissed.  *See Griffin v. Salisbury Police Dep't*, Civ. No. RDB-20-2511, 2020 WL 6135148, at *7 (D. Md. Oct. 19, 2020) ("[T]here is no such cause of action as 'indemnification.'").

## V.  Conclusion

For the foregoing reasons, the Represented Defendants' Motion to Dismiss (ECF No. 16) will be granted in part and denied in part, and Defendant Asekere's Motion to Dismiss (ECF No. 22) will be denied.  A separate Order follows.

DATED this ___8___ day of July, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

30